**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **DWAYNE WILLIAMS**, | **CIVIL ACTION NO.** |
| Plaintiff | **SECTION** |
| v. | **JUDGE** |
| **JASON WILLIAMS, IN HIS OFFICIAL CAPACITY, and ABC INSURANCE COMPANIES 1-10**, | **MAGISTRATE** |
| Defendants. | **JURY TRIAL DEMAND** |

**<u>COMPLAINT</u>**

## TABLE OF CONTENTS

**INTRODUCTION**                                                        3

**JURISDICTION AND VENUE**                                              5

**PARTIES**                                                             6

**FACTUAL ALLEGATIONS**                                                 6

**CAUSES OF ACTION**                                                   37

   **FIRST CAUSE OF ACTION – 42 U.S.C. § 1983**         37

   **SECOND CAUSE OF ACTION — LOUISIANA REVISED STATUTE § 22:1269**   39

**PRAYER FOR RELIEF**                                                  40

## INTRODUCTION

1.     Dwayne Williams was wrongfully convicted and served over twenty-six (26) years in prison for a crime he did not commit, as a result of repeated violations of his constitutional rights by the Orleans Parish District Attorney's Office ("OPDA"). Specifically, OPDA suppressed information that demonstrated Dwayne Williams's innocence, in violation of OPDA's obligations under *Brady v. Maryland* and its progeny.

2.     Dwayne Williams was arrested on January 5, 1995 in connection with the March 22, 1994 murder of Laston Clark and attempted murder of Nathaniel Morgan, which resulted from a shooting that occurred on or around the 7700 block of Hickory Street in Uptown New Orleans. OPDA ultimately prosecuted Dwayne Williams for the first-degree murder of Laston Clark, while suppressing information: (1) showing that Dwayne Williams was not involved in the shooting, and (2) which undermined the prosecution's star witness.

3.     Specifically, OPDA suppressed information establishing and/or confirming that: (1) an eyewitness told the New Orleans Police Department ("NOPD") that he witnessed masked individuals, in a green Monte Carlo, commit the murder before fleeing the scene on foot – contrary to the prosecution's star witness's testimony that the murderers arrived in a brown station wagon and fled the scene in the same vehicle; (2) NOPD located the green Monte Carlo and recovered twenty-one (21) latent fingerprints from within the vehicle – all of which excluded Dwayne Williams as a potential source; (3) NOPD recovered one latent print from a gun found beneath the residence adjoining Dwayne Williams's mother's residence that excluded

Dwayne Williams as a potential source – thereby contradicting OPDA's theory that Dwayne Williams had left weapons beneath the residence after the murder; (4) an eyewitness told NOPD he saw one of the individuals involved in the shooting fleeing the scene on foot, that the individual was not from the area, and that he could identify the individual if given a chance – again contradicting the prosecution's star witness' testimony that the murderers left in a brown station wagon, exculpating Dwayne Williams (who was from the area), and undermining the thoroughness of NOPD's investigation for failing to provide a photo lineup to said witness; and (5) an additional eyewitness told NOPD he saw one of the individuals involved in the shooting fleeing the scene on foot and that he could identify the individual if given a chance – again contradicting the prosecution's star witness' testimony that the murderers left in a brown station wagon and undermining the thoroughness of NOPD's investigation for failing to provide a photo lineup to said witness.

4.      This favorable evidence was, in all respects, material and favorable to Dwayne Williams's defense. The evidence – if disclosed – would have completely undermined the case against Dwayne Williams. Had the ADA's fulfilled their constitutional and ethical obligations, Dwayne Williams would never have been wrongfully convicted and unlawfully held for over twenty-six (26) years**.**

5.      After over twenty-six (26) years, Dwayne Williams was vindicated. OPDA's Civil Rights Division joined in a "Joint Motion to Vacate Conviction" which was "based on significant information discovered since trial that was not known to the jury which convicted Mr. Williams and which cast doubt on his guilt and on the integrity of the process by which he was convicted."   OPDA further agreed that

4

"favorable information…had been in the possession of the State during their trial…[but] was not turned over to the defense." The District Court ultimately granted the motion and vacated Dwayne Williams's conviction and OPDA noticed its intent to *nolle prosequi* the prosecution on September 1, 2022.

6.      As a direct and proximate result of Defendants' conduct, Dwayne Williams has suffered injuries and damages, including: pain and suffering, severe mental anguish, emotional distress, lost income, physical illness, inadequate medical care, humiliation, injury to reputation, permanent psychological damage, and restriction of all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, travel, enjoyment, and expression. Many of these injuries and harms continue even after Dwayne Williams's release from prison.

7.      Dwayne Williams now seeks to hold accountable those responsible for depriving him of his freedom for more than one-half of his life.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over Dwayne Williams's 42 U.S.C. § 1983 claim pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

9.      This Court has subject matter jurisdiction over Dwayne Williams's state-law claim pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) (2).

## PARTIES

11.     Plaintiff Dwayne Williams is a 51-year-old Texas resident who lives in Splendora, Texas.

12.     Defendant Jason Williams, whom Dwayne Williams sues in his official capacity only, is the Orleans Parish District Attorney and head of the Orleans Parish District Attorney's Office ("OPDA"), a local government agency located in the Parish of Orleans, State of Louisiana.

13.     Defendants ABC Insurance Companies 1-10 are as-yet unknown insurance companies who may have issued and currently have in effect one or more policies of insurance covering Defendant Jason Williams and OPDA and/or the actions complained of herein.

## FACTUAL ALLEGATIONS

### The Murder of Laston Clark

14.     On the evening of March 22, 1994, Laston Clark, Nathaniel Morgan, and Alton Morgan were visiting Greta Dixon and her husband, Jon Dixon at their home located at 7728 Hickory Street in Uptown, New Orleans. At approximately 11:15 p.m., Laston Clark and Nathaniel Morgan were just outside the Dixon residence, working under the hood of their car when two unknown individuals approached Mr. Clark and Mr. Morgan and began shooting at them. Mr. Clark ran down the street, while Mr. Morgan took cover beneath the car. Ultimately, Mr. Morgan escaped the shooting uninjured. Mr. Clark, however, was found half a block away from where the shooting began, lying on the curb, dead from multiple gunshot wounds.

15.     After escaping, Mr. Morgan ran into the Dixon residence, told Greta Dixon to call
        the police, and then drove himself and his cousin, Alton Morgan, to a store on South
        Claiborne – fearful that his assailants would return.

16.     Following the reported shooting, Detective Louis Berard of the NOPD Homicide
        Division arrived to the scene accompanied by fellow NOPD Detectives Luis Suarez,
        Michael Fejka, Ross Mocklin, David Gaines, Eric Hessler, and Patrick Jones. The
        NOPD Detectives initiated their scene investigation and canvassed the area for
        possible witnesses – whose interviews are summarized in the NOPD's supplemental
        police report.

17.     Nathaniel Morgan informed the NOPD Detective that, while he and Laston Clark
        were working under the hood of the car, two unknown masked individuals – one
        wielding a shotgun, the other with dual pistols – ambushed Morgan and Clark and
        began shooting at them. Morgan further relayed that Clark ran off while being chased
        by the individual with the shotgun. Meanwhile, Morgan crawled underneath the car
        while the individual with the two pistols continued shooting at him, culminating in
        the shooter pointing one of the pistols at Morgan's head and pulling the trigger – but
        the gun did not fire. Afterwards, the individual fled the scene on foot.

18.     Another witness, Ken Templin, informed the NOPD Detective that he was inside
        his residence when he heard several gunshots. He then walked to his front door and
        observed two Black males running in a lakebound direction on Burdette Street before
        turning onto Spruce Street and entering into a driveway beside a split-double
        residence at 7725/27 Spruce Street. The two Black males then reemerged from the

7

alleyway and ran down Spruce Street in a downtown direction before turning onto Adams Street in a river bound direction.

19.     Detectives relocated to the residence at 7725/7727 Spruce Street, where they discovered (1) a .30 caliber rifle, (2) three handguns, (3) a red sweatshirt, and (4) a blue jacket beneath the house on the 7725 side. Detectives submitted these items to the Crime Lab for forensic testing.

20.     Ballistics testing eventually connected at least two of the recovered pistols to the shooting.

21.     However, detectives were unable to identify any suspects and the investigation remained largely dormant for the next seven months. As a representative from OPDA would later acknowledge, "there were no leads as to the identity of the individuals in this case for many months afterwards. And it was not until a just turned 17-year old child was concerned about a situation he, himself, had with the police until the police had any names in connection with this homicide."

**Alfred Moore and his False Statement to Police**

22.     In November of 1994, an NOPD officer encountered seventeen-year-old Alfred Moore, who was driving a stolen car. The officer eventually brought Moore to NOPD's Juvenile Division, where another officer told Moore that, to be released to his foster parents, Moore would have to "give [the NOPD officer] some information." In response, Moore gave NOPD detectives a statement about Laston Clark's murder, claiming that three individuals with whom he was acquainted – Dwayne Williams, Danielle Rideau, and Donille Ross – were responsible for the murder.

23.     According to Alfred Moore's statement, on the night of the murder, Moore was selling drugs near the scene of the shooting, when he was approached by Dwayne Williams and Daniel Rideau, who told Moore to "get off the corner" and that they (Williams and Rideau) would "be back." Moore further stated that Rideau and Williams, subsequently returned in an older model "four door, light brown station wagon" with a "white stripe on the side" being driven by and Donille Ross. The three waited in the brown station wagon until Laston Clark and Alton Morgan left Greta Dixon's house. Ross then drove the vehicle towards Clark and Morgan, at which time Williams and Rideau exited the vehicle and began shooting at Cark and Morgan. According to Moore, while Dwayne Williams and Daniel Rideau were shooting at Clark and Morgan, Donille Ross followed behind them in the brown station wagon. After the shooting, Dwayne Williams and Daniel Rideau got back into the brown station wagon and fled the scene.

24.     Det. Berard subsequently provided Alfred Moore with photo lineups of Dwayne Williams, Daniel Rideau, and Donille Ross. Moore positively identified all three individuals.

25.     The following day, relying on the information provided by Moore, Det. Berard obtained arrest warrants for Dwayne Williams, Daniel Rideau, and Donille Ross.

26.     Dwayne Williams and Daniel Rideau were eventually arrested and charged with first-degree murder for the shooting death of Laston Clark.[1]

---

[1] Before he could be arrested, Donille Ross was murdered on December 21, 1994.

**Trial and OPDA's Reliance on Alfred Moore's Testimony**

27.     Dwayne Williams pled not guilty to the murder and proceeded to trial on October 11, 1995. The trial lasted two days, and on October 12, 1995, the jury found Dwayne Williams guilty of first-degree murder and subsequently recommended a sentence of life imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence.

28.     The prosecution's entire case revolved around the purported eyewitness testimony of Alfred Moore – the only witness who ever identified Dwayne Williams as being involved in the murder.

29.     As a representative of OPDA subsequently acknowledged in a "Joint Agreement and Motion to Vacate Conviction", filed in Orleans Parish Criminal District Court on August 31, 2022, the prosecution's "case was primarily the testimony of Alfred Moore who claimed he had been out on the block in the vicinity of Greta Dixon's house selling drugs all day and that he had seen Rideau and [Dwayne] Williams before the crime, when they had warned him to get out of the way, and that he later saw them pull up in a brown station wagon, shoot Clark and try to shoot Morgan, and then drive off."

30.     During closing arguments at trial, ADA Lisa Lavie likewise acknowledged that "the only real evidence that points to [Dwayne Williams and Daniel Rideau] is Alfred Moore," urging the jury that "if you believe Alfred Moore, then that's all you need" and that "if you believe [Alfred Moore] then you can convict."   Or, as she succinctly put it during her final remarks: "he [Alfred Moore] is our case."

31.     More recently, a representative from OPDA acknowledged: "the case against them was entirely an eyewitness identification."

32.     Conversely, counsel for Dwayne Williams sought to undermine Moore's testimony by highlighting inconsistencies and contradictions existing between his testimony and the testimonies of other witnesses and other evidence.

33.     In addition to Moore's identification, the only other evidence used to associate – at least circumstantially – Dwayne Williams with the murder, was the fact that NOPD recovered guns used in the murder from beneath the house adjoining Dwayne Williams's mother's house. During closing argument, ADA Egan argued "that's something you just can't (sic) past is that guns were found at Dwayne Williams's house. That's something you just can't get past." And during her rebuttal argument, ADA Lavie argued "Dwayne Williams put the gun where he keeps the guns, where we know the guns have been kept…He put the gun by his house."

34.     Subsequent post-conviction investigation revealed that OPDA had suppressed critical pieces of favorable evidence that exculpated Dwayne Williams and undermined both Alfred Moore's credibility and Dwayne Williams's connection to the guns found beneath his mother's house.

**Dwayne Williams's Requests for Discovery and OPDA's *Brady* Obligations**

35.     Prior to his trial, Dwayne Williams's counsel filed a motion for discovery, requesting much, if not all, of the information OPDA ultimately withheld. However, even without such requests, OPDA remained constitutionally obligated to disclose such information to Dwayne Williams.

36.    OPDA's obligation to disclose such information to Dwayne Williams has been detailed in a series of decisions by the United States Supreme Court, beginning with *Brady v. Maryland*, 373 U.S. 83 (1963), in which the Court held that, under the United States Constitution, the prosecution in a criminal case is required to disclose to the defendant any information that is favorable to the defendant where such information is material to guilt or innocence. (This requirement will hereinafter be referred to as OPDA's "*Brady* obligations").

37.    Such favorable information includes (a) information that the defendant was not guilty of the crime charged; (b) information that another person, and not the defendant, committed the crime charged; (c) information that could be used to impeach the reliability, credibility, or (in any other respect) accuracy of a prosecution witness's testimony; (d) information that is in the possession of not only the prosecution but also the police or other law enforcement agencies that participated in the investigation or prosecution of the defendant; (e) favorable information – including, but not limited to, information of the types described in (a) through (d) above – that law enforcement authorities possess but is not documented.

38.    These requirements are fundamental aspects of our country's criminal justice system that all prosecutors are required and expected to be familiar with and follow. They have been promulgated and reiterated by the United States Supreme Court on several occasions since its decision in *Brady*, including in *Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Agurs*, 427 U.S. 97 (1976); and in *Kyles v. Whitley*, 514 U.S. 419 (1995).

**Dwayne Williams's Discovery of Withheld *Brady* Materials**

39.    Following the affirmance of his conviction on direct appeal, Dwayne Williams continued to challenge the validity of his conviction through post-conviction relief.

40.    Dwayne Williams submitted a public records request for OPDA's file. Within the materials provided in response to the request were multiple supplemental police reports, detailing numerous pieces of information that were known to OPDA at the time of Dwayne Williams's trial and which exculpated Dwayne Williams or impeached Alfred Moore, or both. However, neither the reports, nor the information contained therein were provided to Dwayne Williams, or to his attorney at the time of trial.

41.    During a recent hearing in the Orleans Parish Criminal District Court, on September 1, 2022, a representative from OPDA acknowledged that the OPDA file contained "significant information that tended to either point to alternative perpetrators or exculpate either Mr. Rideau or Williams, or both, that had not been turned over to the Defense."

42.    This previously withheld information – along with newly discovered information – showed that Dwayne Williams was, and is, innocent of the murder for which he was wrongfully convicted.

*Eyewitness Statement Regarding Masked Individuals in a Green Monte Carlo*

43.    Within the suppressed police reports was information detailing an eyewitness's statement to NOPD that (1) a green Monte Carlo – not a brown station wagon – was the vehicle involved in the murder of Laston Clark, and (2) after the shooting, the perpetrators fled the scene on foot – they did not drive away.

44.     More specifically, the suppressed report contained information that, on the day

after the shooting, a confidential informant ("CI") contacted a detective from NOPD

and reported that, approximately thirty minutes before the shooting, the CI observed

two Black males wearing masks and waiting in a green Chevrolet Monte Carlo near

the Dixon residence. The masked individuals repeatedly warned passers-by in the

area to "stay off the corner." The CI further stated he witnessed the masked

individuals exit the vehicle and chase Mr. Clark and Mr. Morgan while shooting at

them. The CI further stated that the masked individuals did not return to the green

Monte Carlo but fled the scene on foot. The CI further stated there were shotgun

shells seen lying on the seat of the vehicle for at least one to two days after the

shooting occurred.

45.     Detectives eventually impounded the green Chevrolet Monte Carlo – which had

previously been reported stolen – and recovered twenty-one (21) latent fingerprints

from items found inside the vehicle.

46.     As detailed above, OPDA was obligated to disclose any information that would

be favorable or exculpatory in any manner, pursuant to their *Brady* obligations; and to

disclose any evidence that would be considered impeachment evidence.

47.     At no time prior to, or during trial did OPDA disclose to Dwayne Williams, his

counsel, or to the jury information regarding the CI's statement, or the investigation

regarding the green Monte Carlo.

48.     During a post-conviction evidentiary hearing, on June 30, 2000, a representative

from OPDA stipulated that the supplemental reports, which contained information

regarding the CI's statement and the green Monte Carlo, were not turned over to the Defense.

49.     In a "Joint Agreement and Motion to Vacate Conviction", filed in Orleans Parish Criminal District Court on August 31, 2022, a representative from OPDA acknowledged that information concerning the CI's statement "was evidence that the perpetrators did not arrive in a brown station wagon and get back in the same vehicle and leave, as testified to by Alfred Moore."

50.     The statement by an eyewitness to detectives that he saw the perpetrators in a green Monte Carlo – not in a brown station wagon – and that the perpetrators fled the scene of the shooting on foot – not via the brown station wagon – constituted exculpatory and otherwise favorable information that was material to the defense. It also constituted evidence that would have impeached the testimony of Alfred Moore. OPDA was obligated to disclose this information to Dwayne Williams and OPDA's failure to do so undermines confidence in the jury's verdict.

*Exculpatory Latent Prints from Items in the Green Monte Carlos*

51.     Following the CI's report, Det. Berard requested that the NOPD Crime Lab Unit impound the green Monte Carlo and process it for evidence. Upon processing the vehicle, crime lab technicians collected fourteen aluminum soft drink cans and several pieces of paper from within the Monte Carlo. These items yielded at least twenty-one (21) latent prints of value. NOPD's crime lab eventually compared these twenty-one (21) latent prints with Dwayne William's fingerprints.

52.     Ultimately, the comparisons excluded Dwayne Williams as a possible source for any of the twenty-one (21) fingerprints recovered from within the green Monte Carlo.

On March 17, 1995, NOPD Officer McKenzie reported the results of the latent print comparisons, which were eventually included in a supplemental police report.

53.     As detailed above, OPDA was obligated to disclose any information that would be favorable or exculpatory in any manner, pursuant to their *Brady* obligations; and to disclose any evidence that would be considered impeachment evidence.

54.     In a "Joint Agreement and Motion to Vacate Conviction", filed in Orleans Parish Criminal District Court on August 31, 2022, a representative of OPDA acknowledged that "[t]he print exclusions are favorable and should have been disclosed to defense counsel."

55.     At no time prior to, or during trial did OPDA disclose to Dwayne Williams, his counsel, or to the jury information regarding the exculpatory results of the fingerprint analyses conducted on items taken from inside the vehicle allegedly occupied by the individuals who murdered Laston Clark.

56.     During a post-conviction evidentiary hearing, on June 30, 2000, a representative from OPDA stipulated that the supplemental reports, which included the results of these fingerprint analyses, were not turned over to the Defense.

57.     That twenty-one (21) fingerprints were recovered from inside the same vehicle allegedly occupied by the perpetrators prior to the murder and that fingerprint comparisons excluded Dwayne Williams as a potential source of the prints, constituted exculpatory and otherwise favorable information that was material to the defense. It also constituted evidence that would have impeached the testimony of Alfred Moore.  OPDA was obligated to disclose this information to Dwayne Williams and OPDA's failure to do so undermines confidence in the jury's verdict.

*Exculpatory Latent Prints from a Gun Recovered from 7725/27 Spruce St.*

58.     Additionally, the supplemental reports contained information regarding fingerprint analyses conducted on a latent print recovered from one of the pistols found underneath 7725 Spruce Street.

59.     As detailed above, during NOPD's search of the split residence at 7725/27 Spruce Street, detectives recovered three pistols from beneath residence. The pistols were submitted for forensic processing and one of the pistols yielded one (1) latent fingerprint of value. NOPD's crime lab eventually compared the latent fingerprint from the gun to Dwayne Williams's fingerprints.

60.     The comparison excluded Dwayne Williams as a possible source for the fingerprint. On March 17, 1995, NOPD Officer McKenzie reported the results of the latent print comparisons, which were eventually included in a supplemental police report.

61.     As detailed above, OPDA was obligated to disclose any information that would be favorable or exculpatory in any manner, pursuant to their *Brady* obligations; and to disclose any evidence that would be considered impeachment evidence.

62.     In a "Joint Agreement and Motion to Vacate Conviction", filed in Orleans Parish Criminal District Court on August 31, 2022, a representative of OPDA acknowledged that "[t]he print exclusions are favorable and should have been disclosed to defense counsel."

63.     At no time prior to, or during trial did OPDA disclose to Dwayne Williams, his counsel, or to the jury information regarding the exculpatory results of the fingerprint analyses conducted on a pistol found underneath 7725/27 Spruce Street.

64.   During a post-conviction evidentiary hearing, on June 30, 2000, a representative from OPDA stipulated that the supplemental reports, which included the results of these fingerprint analyses, were not turned over to the Defense.

65.   That Dwayne Williams was excluded as a possible source for a fingerprint found on one of the guns recovered from beneath 7725/27 Spruce Street, constituted exculpatory and otherwise favorable information that was material to the defense. It also constituted evidence that would have impeached the testimony of Alfred Moore. OPDA was obligated to disclose this information to Dwayne Williams and OPDA's failure to do so undermines confidence in the jury's verdict.

*Eyewitness Statement of Steven Suter*

66.   Additionally, the supplemental reports contained information about a statement made to NOPD by Steven Suter, an eyewitness to events immediately following the shooting. The details of Suter's statement directly contradict Alfred Moore's statement and trial testimony.

67.   Steven Suter informed the NOPD detective that he was inside his residence with his windows open when he heard several gunshots of what sounded like different types of guns. After hearing the shots, Suter relocated to his front porch, where he observed a Black male holding a shotgun and jogging down the street in a downtown direction. Suter further relayed that he got a good look at the individual's face, and that the individual was not from the neighborhood. Suter further advised that, given the opportunity, he would be able to identify the individual.

68.     As detailed above, OPDA was obligated to disclose any information that would be favorable or exculpatory in any manner, pursuant to their *Brady* obligations; and to disclose any evidence that would be considered impeachment evidence.

69.     In a "Joint Agreement and Motion to Vacate Conviction", filed in Orleans Parish Criminal District Court on August 31, 2022, a representative of OPDA acknowledged that: (1) information "[t]hat one of the perpetrators was fleeing on foot contradicts Alfred Moore's testimony that they got back into a brown station wagon and fled the scene" and (2) that Suter said he could identify the individual but was never given the opportunity "impeaches the thoroughness of the State's investigation."

70.     Additionally, the fact that Suter stated the individual was not from the neighborhood exculpated Dwayne Williams, who was from the neighborhood.

71.     At no time prior to, or during trial did OPDA disclose to Dwayne Williams, his counsel, or to the jury information regarding Steven Suter's statement.

72.     During a post-conviction evidentiary hearing, on June 30, 2000, a representative from OPDA stipulated that the supplemental reports, which included information on Suter's statement, were not turned over to the Defense.

73.     This eyewitness's statement to detectives that he saw one of the perpetrators flee the scene of the shooting on foot – not in a brown station wagon –, and that the individual was not from the neighborhood, constituted exculpatory and otherwise favorable information that was material to the defense. It also constituted evidence that would have impeached the testimony of Alfred Moore.  Additionally, the fact that NOPD never provided Suter with an opportunity to identify the shooter, despite his willingness to do so, would have impeached the thoroughness of NOPD's

investigation. OPDA was obligated to disclose this information to Dwayne Williams and OPDA's failure to do so undermines confidence in the jury's verdict.

*Eyewitness Statement of Brant Johnson*

74.    Within the suppressed supplemental report was information pertaining to a statement made to detectives by Brant Johnson, an eyewitness to events immediately following the shooting.

75.    Brant Johnson, who lived nearby the scene of the murder, informed an NOPD detective that he was inside his house when he heard the gunshots. Johnson then walked out onto his front porch, and moments later, observed a Black male carrying a sawed off shotgun and hurriedly walking down Adams Street before turning right on Spruce Street.  Johnson further informed the detective that he "got a good look at the suspect's face and probably could identify him if he saw him again."

76.    As detailed above, OPDA was obligated to disclose any information that would be favorable or exculpatory in any manner, pursuant to their *Brady* obligations; and to disclose any evidence that would be considered impeachment evidence.

77.    In the "Joint Agreement and Motion to Vacate Conviction", a representative of OPDA acknowledged that: (1) information "[t]hat one of the perpetrators was fleeing on foot contradicts Alfred Moore's testimony that they got back into a brown station wagon and fled the scene" and (2) that Johnson said he could identify the individual but was never given the opportunity "impeaches the thoroughness of the State's investigation."

78.    At no time prior to, or during trial did OPDA disclose to Dwayne Williams, his counsel, or to the jury information regarding Brant Johnson's statement to detectives.

79.     During a post-conviction evidentiary hearing, on June 30, 2000, a representative from OPDA stipulated that the supplemental reports, which included information on Johnson's statement, were not turned over to the Defense.

80.     That an eyewitness informed detectives that he saw one of the perpetrators flee the scene of the shooting on foot – not in a brown station wagon – constituted exculpatory and otherwise favorable information that was material to the Defense. It also constituted evidence that would have impeached the testimony of Alfred Moore. Additionally, the fact that NOPD never provided Johnson with an opportunity to identify the shooter, despite his willingness to do so would have impeached the thoroughness of NOPD's investigation. OPDA was obligated to disclose this information to Dwayne Williams and OPDA's failure to do so undermines confidence in the jury's verdict.

**Criminal District Court Vacates Dwayne Williams's Conviction**

81.     On August 31, 2022, counsel for Dwayne Williams and an OPDA representative, filed a "Joint Agreement and Motion to Vacate Conviction," jointly moving the court "to vacate Mr. Williams' conviction based on significant information discovered since trial that was not known to the jury which convicted Mr. Williams and which cast doubt on his guilt and on the integrity of the process by which he was convicted."

82.     In addition to the above-referenced "favorable information" that was possessed by OPDA during the trial but "was not turned over to the defense," the Joint Agreement set forth several stipulations that exculpated Dwayne Williams and undermined the validity of his conviction.

83.    First, OPDA stipulated that, if called to testify, Sonia Moore – Alfred Moore's sister – would testify that "Alfred Moore has been severely mentally unstable all his life," that he "is not a reliable witness" and that "no one should be in prison based on anything my brother said."

84.    Additionally, OPDA stipulated that Charles Moore – Alfred Moore's cousin – would testify as follows: that Charles Moore "was out there on the block near where Mr. Clark was killed all day on the day of the murder, that he knows for a fact that his cousin Alfred Moore was not out there that day, that he saw the 3-4 guys wearing masks pull up in the car and he knows that Dwayne Williams was not either out there that day or in the car." Additionally, that "he knows for a fact that Dwayne Williams is innocent and that, before his most recent institutionalization for mental illness, Alfred Moore told Charles that he wanted to do whatever he could to set right what he did to Mr. Williams."

85.    OPDA also stipulated that Shirley Williams – Dwayne Williams's mother – would testify that "she was not at home when the murder happened, but she came home a little while after it had happened and the neighbors and people in the street told her not to go in her yard because some guys had run in the back and left something there. None of the people who told her that 'some guys' had run in the back ever told her it was her son and they all knew Dwayne."

86.    OPDA further agreed that "[t]here is no question that the jury which convicted Mr. Williams was ignorant of a significant amount of relevant, admissible, evidence which either undermined the State's only eyewitness or tends to suggest Mr. Williams

was not one of the perpetrators." OPDA further acknowledged that some of this evidence "[w]as withheld" from the Defense before trial.

87.    On September 1, 2022, an evidentiary hearing was held on the Joint Motion to Vacate Conviction in the Orleans Parish Criminal District Court, before the Honorable Darryl Derbigny.

88.    At the hearing, an OPDA representative acknowledged they had "no confidence in this first degree murder conviction," and were "prepared…to file a Joint Motion to Vacate [Dwayne Williams's] conviction."

89.    At the end of the hearing, Judge Derbigny granted the Joint Motion and OPDA noticed its intent to *nolle prosequi* the prosecution.

90.    On September 1, 2022, Dwayne Williams walked out of Angola Penitentiary after spending over twenty-six (26) years in prison for a crime he did not commit, solely because of OPDA's violation of his right to material, favorable information.

**OPDA's Longstanding Policy and Custom of Violating the Constitutional Rights of Defendants by not Disclosing Material, Favorable Information to Them**

91.    OPDA's repeated violation of Dwayne Williams's constitutional right to the disclosure of favorable evidence was not an isolated event. To the contrary, it was part of a longstanding pattern of similar violations by OPDA that started years before Dwayne Williams's trial and continued for many years after.

92.    OPDA has maintained and carried out an unconstitutional policy, custom, and practice of violating the constitutional rights of defendants charged with crimes by failing to disclose to them information that is favorable to the defendants.

93.     Under *Brady*, prosecutors violate a defendant's constitutional due process rights by withholding or failing to disclose evidence that is "favorable to the defense and material to the defendant's guilt or punishment." Evidence is "material" when there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." The Supreme Court has made clear that the *Brady* obligation includes both impeachment evidence and exculpatory evidence. A prosecutor also has an obligation "to learn of any favorable evidence known to the others acting on the government's behalf . . . including the police," and that the materiality inquiry "turns on the cumulative effect of all such evidence suppressed by the government."

94.     In 2017, the Louisiana Court of Appeal, Fourth Circuit noted "the storied, shameful history of the local prosecuting authorities' noncompliance" with its duty to disclose to defendants information that is favorable to them.

95.     As a result of this unconstitutional policy or custom, OPDA has engaged in the wrongful prosecution of innocent persons and, upon information and belief, has failed in many such instances to prosecute the real perpetrators.

*Unconstitutional Written Policy*

96.     In 1987 Harry Connick – the then-head of OPDA and its official policymaker – officially adopted or promulgated a "Policy Manual" for OPDA. In a letter included in the manual Connick stated that "we have developed a policy manual outlining the duties and responsibilities of those who work" at OPDA.

97.     At all times relevant, District Attorney Harry Connick was acting as an independent local official policymaker in establishing OPDA's internal policies and

training regarding prosecutors' acquisition of, security of, and disclosure of *Brady* materials.

98.     The manual, which upon information and belief, remained in force during the period of Dwayne Williams's trial, included a policy regarding the disclosure of favorable information to defendants that provided in pertinent part: "In most cases, in response to the request of defense attorneys, the Judge orders the State to produce so-called *Brady* material – that is, information in the possession of the State which is exculpatory regarding the defendant."

99.  Furthermore, Connick previously testified that *Brady* only requires production of evidence that "exculpates the accused," as opposed to evidence merely "favorable" to the defense. And according to Connick, there could be no *Brady* violation arising out of "inadvertent conduct of [an] assistant under pressure with a lot of case load."

100.    This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it suggested that OPDA prosecutors were obligated to disclose favorable information to a defendant only if the defendant's attorney requested such disclosure when, in truth and in fact, that obligation existed regardless of whether or not the defendant's attorney made such a request.

101.    This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it suggested that OPDA prosecutors were obligated to disclose favorable information to a defendant only if a judge ordered them to do so, when, in truth and in fact, that obligation existed regardless of whether or not the judge ordered disclosure. Indeed, in a much later argument before the United States Supreme Court, the head of OPDA's Appeals Section conceded that

relying upon a judge to determine whether or not OPDA was required to disclose information to a defendant pursuant to *Brady* was a "poor practice."

102.   This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it required OPDA prosecutors to disclose only "exculpatory" information when, in truth and in fact, OPDA was also required to disclose information that could be used to impeach the trial testimony of OPDA witnesses or was otherwise favorable to the defendant, even if it did not directly exculpate the defendant.

103.   This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it did not require OPDA prosecutors to disclose information that was not initially in OPDA's possession but was only in the possession of the NOPD when, in truth and in fact, OPDA was required to disclose such information.

104.   This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it suggested that OPDA's obligation to disclose favorable information to a defendant charged with a crime applied only in most, but not all, cases.

105.   This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it did not expressly require OPDA prosecutors to disclose information that was favorable to the defendant even if that information was not documented.

106.   Additionally, OPDA – under Connick's leadership – exacerbated the unconstitutional policy by imposing severe penalties for ADA's who provided

26

evidence that did not qualify as *Brady* information under Connick's erroneously restrictive interpretation.

*Unconstitutional Unwritten Policy or Custom*

107.    OPDA has maintained and carried out, for many years, an unwritten policy or custom of not disclosing favorable information to defendants charged with crimes.

*OPDA's Numerous Brady Violations Indicating an Unwritten Policy or Custom*

108.    The existence of this unwritten policy or custom is supported by publicly available information in cases in which a court has determined, or OPDA has acknowledged, that OPDA failed to disclose favorable information to a defendant charged with a crime. Based solely on that publicly available information, OPDA has failed to make such disclosures in at least 46 cases, not including Dwayne Williams's case.

109.    Of these 46 cases, at least 34 occurred prior to Dwayne Williams's trial.

110.    Of these 46 cases, at least 27 involved OPDA's failure to disclose information that could have been used to impeach a witness's trial testimony – the same type of constitutional violation that occurred in Dwayne Williams's case. Of these 27 cases, 22 of them occurred prior to Dwayne William's trial.

111.    Of these 46 cases, at least nine resulted in reversals of convictions by the United States Supreme Court; the United States Court of Appeals for the Fifth Circuit; or the Louisiana Supreme Court, the state's highest court, on the basis of *Brady* violations prior to Dwayne Williams's trial. *See Kyles v. Whitley* 514 U.S. 419 (1995); *Monroe v. Blackburn*, 607 F. 2d 148 (1979); *Davis v. Heyd*, 479 F. 2d 446 (5th Cir. 1973); *State v. Knapper*, 579 So. 2d 956 (La. 1991); *State v. Rosiere*, 488 So. 2d 965 (La.

1986); *State v. Perkins*, 423 So. 2d 1103 (La. 1982); *State v. Curtis*, 384 So. 2d 396 (La. 1980); *State v. Falkins*, 356 So. 2d 1 (La. 1978); *State v. Carney,* 334 So. 2d 415 (La. 1976). Of these nine cases, six involved OPDA's failure to disclose information that was inconsistent with the prosecution's witness's trial testimony – the same type of constitutional violation that occurred in Dwayne Williams's case.

112.    The above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way. Unlike other types of constitutional violations, where the defendant is presumably well aware of the potential or actual violation – for example, the use of excessive force or a violation of the defendant's right to a speedy trial – a violation of a defendant's right to the disclosure of favorable information is difficult to detect because it inherently involves the suppression of information.

113.    This phenomenon has been widely recognized by leading members of the legal profession. For example, United States Supreme Court Justice Ruth Bader Ginsberg has stated that *Brady* violations "are not easily detected" and are frequently the result of a "chance discovery." And former United States Supreme Court Justice Byron White has stated that the "judicial process will by definition be ignorant of" a violation involving suppressing evidence when it occurs, and that "it is reasonable to suspect that most violations never surface."

114.    Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional

rights of defendants in this way is that, upon information and belief, the vast majority of cases filed by OPDA have resulted in a guilty plea and no trial. In these cases, it is likely that the pleas occurred prior to the time that the defendants would have uncovered any *Brady* material. In these cases, it is also far less likely that the defendants, having entered a guilty plea and having provided a factual predicate for their pleas, would pursue a post-conviction challenge to their conviction. Since post-conviction litigation is the procedural stage at which many *Brady* violations are uncovered, the substantial prevalence of guilty pleas among OPDA cases dramatically reduces the likelihood of *Brady* violations being detected at anything close to the rate at which they actually occur.

115.   Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that, upon information and belief, there have been cases in which a court determined that OPDA violated *Brady* but the decision was not publicly reported. Connick has testified that this in fact has occurred. In such cases, it is difficult if not impossible for persons such as Dwayne Williams to identify the cases in which failures to disclose favorable information occurred.

116.   Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that, upon information and belief, there have been cases with *Brady* violations in which courts granted relief on other grounds.

117.    Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that many of OPDA's files from the Connick-era have been destroyed by flooding, hurricane, or by court order. A representative from OPDA's Civil Rights Division has acknowledged the practical impossibility of assessing the validity of complaints concerning prosecutorial misconduct "if the records aren't there."

*Additional Court Decisions Establishing OPDA's Policy or Custom of Violating Brady*

118.    In addition to the cases described above, in at least four cases that were decided prior to Dwayne Williams's trial, the Louisiana Supreme Court ruled that a prosecutor from another Louisiana district attorney's office failed to disclose favorable information to a defendant charged with a crime. These cases provide further support for the conclusion that OPDA was well aware of its constitutional obligation to disclose favorable information to the defendants it prosecuted, and yet repeatedly violated that obligation.

119.    OPDA's persistent failure to honor its *Brady* obligations is remarkable, especially in light of the fact that several of the United States Supreme Court's leading decisions in this area of the law involved OPDA itself. For example, as noted above, in April of 1995 – less than six months before Dwayne Williams's trial – the United States Supreme Court decided *Kyles v. Whitley*. In that case, the United States Supreme Court held that OPDA violated the defendant's rights under *Brady* by failing to disclose information obtained by OPDA that the defendant could have used to

impeach the credibility of eyewitnesses who testified at trial – the same type of *Brady* violation that occurred in Dwayne Williams's case.

120.    That OPDA's violations of defendants' *Brady* rights continued even after the *Kyles* decision supports the conclusion that the continued violations were the result of OPDA's unwritten policy or custom of not complying with its *Brady* obligations.

121.    OPDA's description of, and reaction to, the *Kyles* decision provides further support for that conclusion. Connick, the head of OPDA at the time of the decision has testified, incorrectly, that *Kyles* "wasn't a *Brady* case." He also testified that he did not recall that the United States Supreme Court ruled in *Kyles* that the defendant's claim – that OPDA violated its *Brady* obligations – was valid. He also testified that he saw no need to change OPDA's *Brady* policy after the *Kyles* decision. He also testified that compliance with the *Kyles* decision was "not realistic," stating, "insofar as what was in the police file, who the hell knows[.]" And he also has suggested that he disagreed with the *Kyles* decision, stating that "[j]ust because a guy puts on a black robe doesn't mean he is right." This testimony by the longtime Orleans Parish District Attorney, reflects OPDA's disdain for and disregard of the United States Supreme Court's decision in *Kyles* and, in turn, OPDA's obligations under *Brady*.

122.    Connick's disdain for the United States Supreme Court's decision in *Kyles* was not lost on members of his office. In the re-trial of the defendant in *Kyles*, the OPDA prosecutor stated in court that the Court's decision in *Kyles* was wrong.

123.    Despite OPDA's string of *Brady* violations prior to and including *Kyles*, OPDA failed to take adequate measures to prevent future violations. It did not revise its written *Brady* policy. It did not conduct adequate training for OPDA prosecutors on

their *Brady* obligations. And it did not take disciplinary action against OPDA prosecutors who violated *Brady*.

124.    All of these statements, actions, and failures to act in the wake of *Kyles* reflect OPDA's disdain and disregard for its obligations under *Brady*, consistent with its unwritten policy or custom of not complying with those obligations.

*Statements by OPDA Heads and Prosecutors Establishing OPDA's Policy or Custom of Violating Brady*

125.    OPDA's longstanding policy or custom of disregarding its *Brady* obligations is further evidenced by the sworn testimony and admissions of former OPDA prosecutors, Connick, and heads of OPDA who succeeded Connick.

126.    Connick, the head of OPDA at the time of Dwayne Williams's trial, has testified that he was unaware that OPDA's *Brady* obligations required it to disclose all information favorable to the defendant, and not just information that demonstrated that the defendant is not guilty of the crime with which he is charged. This testimony reflects both a misunderstanding of OPDA's *Brady* obligations as well as the inadequacy and unconstitutional nature of OPDA's *Brady* policy. As the United States Supreme Court has stated, a *Brady* violation occurs when the prosecution fails to disclose favorable information to the defendant, regardless of whether the information is directly exculpatory.

127.    Connick has also testified that a prosecutor's failure to disclose favorable information to a defendant due to the prosecutor being under pressure with a large case load would not have constituted a violation of OPDA's *Brady* policy. This testimony reflects both a misunderstanding of OPDA's *Brady* obligations as well as

the inadequacy and unconstitutional nature of OPDA's *Brady* policy.  A *Brady* violation occurs whenever the prosecution fails to disclose material, favorable information to the defendant, regardless of the intent of the prosecutor or the reasons for the failure.

128.    Connick also has testified that his "evaluation" of *Brady* was "poor." This testimony reflects OPDA's disdain and disregard for its obligations under *Brady*, consistent with its unwritten policy or custom of not complying with those obligations.

129.    Eddie Jordan, the former head of OPDA, has stated that "the previous administration [when Connick was the head of OPDA] had a policy of keeping away as much information as possible from the defense attorney." This statement is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

130.    Cannizzaro, another former head of OPDA.  has stated that "[i]n the decades preceding my administration, the District Attorney's office [under Connick] had been in a steady state of decline. Over the course of that time period, bad policy decisions took root and became institutional." In an evident reference to OPDA's repeated violations of its *Brady* obligations, Cannizzaro stated that "some of those policy decisions had collateral consequences in the form of civil liability against the office." This statement is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

131.    OPDA's unwritten policy or custom of not disclosing favorable information to defendants charged with crimes included the post-trial phases of criminal cases. A

former OPDA prosecutor has testified that, when a defendant asserted a *Brady* claim
after the defendant was convicted, there was no policy requiring the prosecutor to
obtain and review the trial file or to communicate with the prosecutor who tried the
case so that OPDA could determine whether the defendant's claim was valid. This
statement is consistent with OPDA having an unwritten policy or custom of not
complying with its *Brady* obligations.

*Additional Evidence Establishing OPDA's Policy or Custom of Violating* Brady

132.    Then-Orleans Parish Criminal District Court Judge Calvin Johnson wrote to
Connick in 1998 to advise him that OPDA prosecutors were failing to comply with
OPDA's *Brady* obligations. Connick ignored the warning and maintained OPDA's
policy or custom of disregarding its *Brady* obligations.

133.    A 2012 study of OPDA concluded that, despite its lengthy history of repeated
violations of its *Brady* obligations, OPDA continued to fail to institute changes to its
policies and customs sufficient to encourage consistent compliance with *Brady*. This
study is consistent with OPDA having an unwritten policy or custom of not
complying with its *Brady* obligations.

134.    A 2012 study of exonerations in the United States from 1989 to 2012 concluded
that New Orleans (Orleans Parish) had the most exonerations per capita of any county
with a population over 300,000, at a rate of more than 13 times the national average.
Nearly all of the exonerations in New Orleans involved *Brady* violations committed
by OPDA. This study is consistent with OPDA having an unwritten policy or custom
of not complying with its *Brady* obligations.

135.    A 2017 study analyzing state appellate court opinions that were issued from 2010

through 2015 and concern prosecutorial misconduct — including *Brady* violations —

found that Orleans Parish had the highest per capita rate of cases involving

misconduct as well as the largest number of reversals of any parish in Louisiana. In

reporting these findings, the study stated that OPDA "has long been a hotbed for

prosecutorial misconduct." This study is consistent with OPDA having an unwritten

policy or custom of not complying with its *Brady* obligations.

*Failure to Train and Supervise*

136.    OPDA's policy or custom of violating the constitutional rights of defendants

charged with crimes by failing to disclose to them information favorable to them is

also demonstrated by its failure to properly and adequately train and supervise OPDA

prosecutors with respect to their *Brady* obligations.

137.    OPDA's failure to properly and adequately train and supervise OPDA prosecutors

with respect to their *Brady* obligations is reflected in many different ways.

138.    As described in paragraphs 96 through and including 105 above, OPDA's written

*Brady* policy, as reflected in OPDA's training manual, inaccurately described

OPDA's *Brady* obligations in several different ways.

139.    Several former OPDA prosecutors have testified that they did not recall receiving

any training on *Brady* at OPDA.

140.    Indeed, following the aforementioned capital case *Kyles v. Whitley*, 514 U.S. 419

(1995), in which the Supreme Court reversed based on OPDA's failure to disclose

information that could have been used to impeach the credibility of witnesses who

testified at trial, Connick stated he was satisfied with OPDA's policies and practices and saw no need for any changes.

141.    Connick's failure to institute policy changes or additional training, despite being on notice that the existing policies and practices were resulting in the violation of defendants' constitutional rights to receive favorable, material information amounts to – at the very least – a deliberate indifference to the defendants' *Brady* rights. Connick was on notice that, without additional training or policy changes, it was highly predictable that OPDA's prosecutors would continue to make incorrect *Brady* decisions.

142.    OPDA also failed to utilize checklists, audits, reviews, or coordinators to ensure that its prosecutors complied with OPDA's *Brady* obligations.

143.    OPDA also failed to discipline OPDA prosecutors who violated OPDA's *Brady* obligations.

144.    For example, Connick has testified that OPDA failed to discipline OPDA prosecutors who violated OPDA's *Brady* obligations because it would make his job more difficult.

145.    As a result of OPDA's failure to discipline OPDA prosecutors who violated OPDA's *Brady* obligations, OPDA prosecutors had little or no reason to be concerned about the consequences if they violated those obligations.

146.    OPDA and the heads of OPDA were aware or should have been aware that OPDA prosecutors had repeatedly violated OPDA's *Brady* obligations and that there was a need to train and supervise prosecutors in order to prevent future, similar violations.

OPDA's failure to train or supervise its prosecutors amounted to deliberate indifference to defendants' constitutional rights under *Brady*.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION – 42 U.S.C. § 1983**
**(Defendant Jason Williams)**

147.    Paragraphs 1 through and including 146 are repeated and re-alleged as if fully set forth herein.

148.    OPDA, acting under color of law, withheld from Dwayne Williams favorable evidence relating to the murder of Laston Clark that was material to Dwayne Williams's guilt or innocence, in violation of Dwayne Williams's right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and 42 U.S.C. § 1983.

149.    At all times relevant to this action, OPDA maintained an unconstitutional written policy, officially adopted and promulgated by OPDA and the heads of OPDA, with respect to OPDA's obligation to disclose favorable information to the defendants it prosecuted.

150.    At all times relevant to this action, OPDA failed to provide adequate training or supervision of OPDA prosecutors with respect to OPDA's obligation to disclose favorable information to the defendants it prosecuted, despite OPDA's awareness of many prior instances in which it violated *Brady* — including in its prosecution of Curtis Lee Kyles, whose conviction was vacated by the United States Supreme Court in *Kyles v. Whitley* less than six months before Dwayne William's trial — and despite the fact that it was obvious that such training and supervision was required in order to

prevent other *Brady* violations. This failure to train and supervise was sufficiently common and well-settled that it constituted a custom that fairly represented OPDA's official policy of not complying with its obligation to disclose favorable information to the defendants it prosecuted.

151.    At all times relevant to this action, OPDA's persistent and widespread custom, reflected in numerous cases, of failing to disclose favorable information to the defendants it prosecuted; its failure to adequately train and supervise OPDA prosecutors with respect to OPDA's *Brady* obligations; and other statements, actions, and omissions reflecting OPDA's failure to comply with or otherwise take seriously its *Brady* obligations, were, when taken as a whole, sufficiently common and well-settled that they constituted a custom that fairly represented OPDA's official policy of not complying with its obligation to disclose favorable information to the defendants it prosecuted.

152.    OPDA and the heads of OPDA were on actual or constructive notice that the above-described official policies and customs failed to protect the right of Dwayne Williams and other defendants like him under the Unites States Constitution to the disclosure of favorable information, but were deliberately indifferent to the known and/or obvious consequence that constitutional violations would result from these official policies and customs.

153.    The policies and customs set forth above were the moving force that caused the deprivation of Dwayne Williams's right under the United States Constitution to the disclosure of favorable information that was material to Dwayne Williams's guilt or innocence.

154.    The conduct set forth above was the cause in fact and proximate cause of Dwayne

Williams's injuries and damages, as described in paragraph 6 above.

155.    Defendant Jason Williams, as the representative of OPDA, is liable to Dwayne

Williams pursuant to 42 U.S.C. § 1983.

**SECOND CAUSE OF ACTION — LOUISIANA REVISED STATUTE § 22:1269**

**(Defendants ABC Insurance Companies 1–10)**

156.    Paragraphs 1 through and including 146 are repeated and re-alleged as if fully set

forth herein.

157.    Defendants ABC Insurance Companies 1–10 may have issued and currently have

in effect one or more policies of insurance covering Defendant Jason Williams and/or

OPDA with regard to the actions complained of herein and obligating Defendants

ABC Insurance Companies 1–10, jointly and/or severally, to pay on behalf of

Defendant Jasons Williams and/or OPDA any sums the insureds may become

obligated to pay Dwayne Williams or to indemnify Defendant Jason Williams and/or

OPDA for any sums the insureds may become obligated to pay Dwayne Williams.

158.    As described above, Defendant Jason Williams, as the representative of OPDA, is

liable to Dwayne Williams for all damages sustained by Dwayne Williams, costs and

reasonable attorney's fees. Defendants ABC Insurance Companies 1–10 may be

contractually obligated to pay all sums on behalf of Defendant Jason Williams and/or

OPDA or to indemnify the insureds for these sums.

159.    Defendants ABC Insurance Companies 1–10 may be liable to Dwayne Williams

for any and all sums described above up to their policy limits, notwithstanding the

fact that Defendant Jason Williams and/or OPDA may themselves be able to assert claims of privilege or immunity from liability.

160.    Pursuant to Louisiana Revised Statute § 22:1269 (B), Dwayne Williams brings a direct action against Defendants ABC Insurance Companies 1–10 to recover any and all sums they are obligated to pay him on behalf of their insureds or for which they are obligated to indemnify their insureds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dwayne Williams requests that this Court enter judgment as follows:

1. On the First Cause of Action, against Defendant Jason Williams, as the representative of the Orleans Parish District Attorney's Office, compensatory and punitive damages in an amount to be determined at trial; costs; and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

2. On the Second Cause of Action, against Defendants ABC Insurance Companies 1-10, an amount equal to any and all sums they are obligated to pay Dwayne Williams on behalf of Defendant Jason Williams and/or the Orleans Parish District Attorney's Office or for which they are obligated to indemnify the insureds; and

3. On both causes of action, granting Dwayne Williams such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Dwayne Williams demands a trial by jury on both causes of action set forth above.

Dated: June 07, 2023

Waiver of Summons                       Respectfully submitted,

                                       */s/ Kelly Patrick Mitchell*
                                       Herbert V. Larson, Jr. (La. Bar No. 8052)
                                       Kelly Patrick Mitchell (La. Bar No. 37807)
                                       LARSON & MITCHELL
                                       ATTORNEYS AT LAW
                                       700 Camp Street
                                       New Orleans, LA 70130
                                       (504) 528-9500
                                       hvl@landmlaw.com
                                       kpm@landmlaw.com

                                       *Attorneys for Dwayne Williams*