1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


KUANTAY REEDER,
        Plaintiff,

VERSUS

                        2:22-cv-04614-JCZ-JVM,
                        Section A
                        Judge Jay C. Zainey
                        Magistrate Div. 1
                        Judge Janis van
                        Meerveld

JASON WILLIAMS, and
ABC INSURANCE COMPANIES 1-10,
        Defendants.

And

        UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF LOUISIANA


DWAYNE WILLIAMS,
        Plaintiff,

                        Civil Action
                        No.
                        2:23-cv-01922-BSL-JVM
                        Section O
                        Judge Brandon S. Long
                        Division 1

VERSUS

JASON WILLIAMS, IN HIS OFFICIAL CAPACITY,
and ABC INSURANCE COMPANIES 1-10
        Defendants.

EXHIBIT
2

too many scotches with the same people you were just fighting with.

You know, I got to know Mr. Connick as a young defense attorney. Occasionally I would go beg for grace and mercy for a client who didn't have a shot in court, look for a number that was less than the number that the prosecutors were asking for in court.

He and his first assistant and an investigator would always be there Constont (sp), would take the meeting. And typically there would be some sort of reduction from where those prosecutors were before.

Q.   And I'm not talking about interactions with the district attorneys or with the district.  I'm talking about amongst you speaking with mentors, how did they speak about Harry Connick's office?

A.   Some were -- some of the comments would be disparaging and some of the comments would be encouraging or very agnostic.  Most of the defense attorneys -- not most.  Yeah.  Most of the

122

this explicitly, but you think that added to, led to certain injustices taking place?

A.    I mean, I certainly think if prosecutors are more concerned with how many cases they win versus how many cases they lose, it can distort and create perverse incentives for the work that they do.

Q.    One potential incentive that they may be incentivized to withhold evidence they should otherwise disclose?

A.    I mean, it certainly could lead to that in terms of extrapolation.  I can tell you that in my time as a judge, I didn't witness that.  And in my time as a prosecutor, I mean as a defense attorney before I was a prosecutor, the ADAs that I worked with were very aware of their Brady obligation between 1998 and when I took office.

ADAs would even call if some information presented itself over the weekend during trial when they were going through with their case file or talking to

the detectives in preparation.  The detectives said, oh, I had some notes on this case I found in my garage.

They would call the court and call me to let me know that this was found.  So I mean, and most of these people are my age.  Most of the defense attorneys when I first started were a lot older.  Bob Glass, Ike Spears, they had me by sometimes 10, sometimes 20 years.  Not a lot of young people.

Most of the public defenders were also really old; Frank, Clive.  And so my peer group were that ages.  I was closer in age with more of the ADAs, but the ADAs I worked with were pretty diligent about turning things over.

And at some point, I don't remember if it was the end of the Connick administration or the beginning of the Jordan administration, they even created a form that was a table of contents or an affidavit of receipt of the discovery materials that would list out what was in it, what was missing, what was

outstanding.

I don't remember exactly which administration put that in place, but there was it seemed maybe to a commitment to that. So firsthand knowledge, my experience I did not -- I was not a victim of it as a defense attorney.

Q. Also in 2019 as part of your campaign promises, you campaigned on introducing reforms to correct problems with prosecutorial misconduct, right?

A. Correct.

Q. And one proposed solution was instituting an open file discovery, right?

A. Correct.

Q. And I know we said that you didn't ultimately do it, but this was a proposed solution to fix instances of prosecutorial misconduct, right?

A. Correct.

Q. And that misconduct would -- the misconduct to be addressed by an open file discovery would be withholding Brady information, right?

A. Give me the question one more

violations with the cases that I tried, nor did I preside over complaints of Brady violations when I served in Section B as judge, or observed the ADAs assigned to my section of court engage in discovery violations firsthand.

Q.   And you've now been the district attorney for over four years, correct?

A.   Has it been that long?  I guess so, yeah.

Q.   And I think as you described before, you oversee the review of many cases by the Civil Rights Division, correct?

A.   Correct.

Q.   And taking into account everything also that you've learned from that experience, do you believe sitting here today that there were systematic problems, or problems at a policy level, with Brady disclosures in Harry Connick's office?

A.   Despite what I expected to see I don't -- I've looked at, you know, I

182

expected there to be evidence, signs of bad dealings, cheating, nefarious activities of some sort, and it's clear that even when there have been Brady violations, they appear to be negligent or accidents due to the volume of cases or the workload.

But I have not seen patterns or policies that were put in place encouraging attorneys to violate discovery obligations in an effort to get a conviction.

In fact, looking -- when you look at the files that I've reviewed the case that we were just talking about earlier, I think Mr. Williams' case, if the goal were to violate defendant's rights by hiding evidence, and they were really bad at it because they were leaving notes in the file memorializing information.

Even in the Reeder case, there was a record that we turned over to opposing counsel of the information that was used in the post conviction.  If the

goal was to cheat and cover it up and hide things, then you don't leave -- you don't leave it in the file.

And so I don't think there was a systematic effort to violate discovery obligations or practices put in place by Mr. Connick to achieve those ends or do those things.

Q.    You were also asked about some statements from your campaign about a win at all cost culture.  Do you recall that?

A.    Yes.

Q.    Do you believe that based on everything you know today, that Harry Connick established a win at all cost culture at his office?

A.    No.  I mean, looking at what existed, if you look at their success rate, it is less than ours.  We're in between 85 and 90 percent now.  I think they were between 60 and 70 during their tenure.

The win at all cost culture is just sort of part of American culture. The idea that people want to be good at

their jobs, they want to achieve and they want to achieve success, and I think I've just -- I wanted to, before I became DA and after I became DA, to remind lawyers that their value and their success rate is not dictated by the number of cases where there is a conviction versus acquittal or a lesser included verdict.

And so they could focus on just results rather than sheer numbers. And I don't -- I have not seen evidence that Mr. Connick or any of the prosecutors before me created or tried to establish a win at all cost culture. But I think it's just a typical thing with type A professions.

Q. Do you believe that Mr. Connick either encouraged or permitted prosecutors to unethical or illegal means to secure convictions?

A. No, no. I don't believe that he encouraged his lawyers to cheat. And, you know, having been DA for now close to four years, I'm not quite sure how an elected prosecutor or his leadership could

189

responsibility for the homicide.

I mean, there's a number of reasons why these cases are not resolved, but it does not mean that in every instance that those were valid Brady claims just because they were raised.

BY MR. PAUL:

Q.   Okay.  You testified earlier about you said as a defense lawyer and as a judge seeing discovery routinely provided at arraignment; is that correct?

A.   That's correct.  In my experience going from 19 probably 96 in that instance because I was in criminal court as a Rule 20 as a clinician at the Tulane Law Clinic, the routine during my years was that ADAs would provide a discovery packet, and all the discovery in their possession at arraignment or shortly after arraignment if there was a problem getting things copied and getting it collated.

And they would also routinely provide any other information that was discovered at a later date by the

detectives.  They would provide that in court and to the defense attorneys.  To me as a defense attorney that was my experience.

Q.    And just to be clear, at arraignment that would be before any formal motion by the defense, correct?

A.    Correct.  I mean every defense attorney is not created equal.  Every prosecutor is not created equal.  Some defense attorneys file motions in every case, ominous motions in every case.

Some defense attorneys file particularized motions that are very specific to their case.  And there are some defense lawyers at Tulane and Broad that don't file anything ever.

But the practice that I observed and experienced was prosecutors in Orleans Parish from '98 on would turn over that evidence as close to arraignment as possible regardless of what the defense attorney had filed.  It wasn't in response to motions that were filed.

Q.    Okay.  Mr. Williams, I have no